IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM J. RAYNOR, JR. and )
KARA R. RAYNOR, )
                                          )
            Plaintiffs, )
                                          )
       v.                                 )      1:18CV291
                                          )
TOWN OF CHAPEL HILL, et al., )
                                          )
            Defendants. )

ORDER, RECOMMENDATION,
AND MEMORANDUM OPINION

This matter comes before the Court on Defendants' Motion to Dismiss. In this case,

Plaintiffs William J. Raynor, Jr. and Kara R. Raynor assert federal and state constitutional

claims against the Town of Chapel Hill and members of its Historic District Commission

("HDC"). For the reasons that follow, the Court recommends that the Motion to Dismiss be

granted as to the federal claims, and that the state law claims be remanded to state court.

I.     FACTS, CLAIMS, AND PROCEDURAL HISTORY

This case arises out of Plaintiffs' efforts to obtain a Certificate of Appropriateness

("Certificate") with respect to the construction of a residence in a designated historical district

in the Town of Chapel Hill. Plaintiffs ultimately obtained the Certificate from the Town of

Chapel Hill on September 18, 2017, after alleged denials and delays by the HDC beginning in

April 2016. Plaintiffs contend that the 16 months of denials and delays by the HDC violated

their federal substantive due process rights and their state constitutional rights. This action

was initially filed in state court and was timely removed to this Court. Because this matter is

before the Court on a motion to dismiss, the Court sets out here the factual contentions as alleged in the Complaint.

Plaintiffs allege that that they intended to build a single-family home in the Town's Franklin-Rosemary Historic District on a lot that was empty except for a 294-square-foot "cottage" or "pony barn" structure. (Compl. [Doc. # 2] ¶¶ 24-25.) Because the lot was located in the Historic District, a Certificate of Appropriateness was required in order to erect, alter, restore, move, or demolish any exterior portion of a building or other structure. (Id. ¶ 28.) Plaintiffs allege that under the Town's Land Use Management Ordinances, their intended use was a "use of right" because the area was zoned for residential use. However, Plaintiffs also allege that for lots within the Historic District, additional "use regulations" apply regarding architectural style, general design, general arrangement of a building or other structure, size and scale of the building, type and style of fixtures, and other similar matters. (Id. ¶¶ 26-29). Plaintiffs state that in April 2016, they attended a meeting of the Historic District Commission ("HDC") and participated in a courtesy review of their proposal, receiving generally positive feedback, but with a preference that the 294-square-foot cottage be preserved. In response to the feedback, Plaintiffs modified their plans to include relocating the 294-square-foot cottage to a neighboring property, and Plaintiffs presented this plan for a courtesy review at the June 14, 2016 HDC meeting. (Id. ¶¶ 30-34.) According to the Complaint, the HDC postponed consideration of Plaintiffs' application and "suggested [Plaintiffs' submit] an application to move the existing [cottage] structure . . . to be heard simultaneously" with their application for

a Certificate of Appropriateness for their proposed residence. (Id. ¶¶ 33-36.) At the next HDC meeting in July 2016, members expressed a desire to maintain the cottage on Plaintiffs' property, denied Plaintiffs' application to relocate the cottage, and continued the hearing on the Certificate for Plaintiff's proposed residence. (Id. ¶¶ 38-43.) Plaintiffs did not appeal the decision. (Id. ¶ 44.) Instead, Plaintiffs revised their application and the matter was presented for consideration at an HDC meeting on September 8, 2016. (Id. ¶¶ 45-48.) At the meeting, Plaintiffs presented an inspection report indicating the deficiencies and structural issues with the cottage, and the HDC was informed that Plaintiffs had offered the cottage to the University of North Carolina as a gift, but the University declined the offer to relocate the structure "because there was not a compelling historical rationale" for it. (Id. ¶¶ 49-51.) Plaintiffs' revised plan kept the structure on the lot, but Plaintiffs also applied to demolish the cottage if that became necessary, with a stipulation that demolition be delayed for 365 days, to September 8, 2017, to allow them to work out an alternative. (Id. ¶¶ 48-51, 57-58.) That request was granted, but consideration of the merits of Plaintiffs' application was again postponed, this time in deference to the request of neighboring property owner who appeared at the meeting. (Id. ¶¶ 52-55.) Plaintiffs allege they attended the next meeting on October 13, 2016, and at that time, despite complying with all applicable ordinances, a neighbor expressed concerns that "the structure proposed was too large for the Lot." (Id. ¶ 61.) HDC members commented that: "the design did not provide ample setbacks" (Defendant Sweet); the house "was not typical of the neighborhood 'spaciness'" (Defendant Smith); that "the Lot has been

3

subdivided and [that] 'infill' on a legally subdivided lot does not 'retain character'" (Defendant Kyser); and that North Carolina "does not protect adjoining property owners in appeals" and "that the HDC needed to give deference to neighbors" (Defendant Kyser). (Id. ¶¶ 62-65.) Plaintiffs' application for a Certificate was denied by a 6 to 1 vote, and Plaintiffs contend that the reasons given for the denial, *i.e.*, that the house was too large, that the setbacks were insufficient, that the house was "not typical of neighborhood spaciness," and that the proposed infill on a subdivided lot did not retain character, were not factors specifically included in the Town's Land Use Ordinances. However, Plaintiffs did not appeal this denial. (Id. ¶¶ 66, 68.) Instead, on December 12, 2016, Plaintiffs submitted what they identified as a new application for a Certificate of Appropriateness with the Town's Office of Planning and Sustainability, and that application was presented to the HDC for consideration at its January 10, 2017 meeting. (Id. ¶¶ 72-79.) According to the Complaint, although the materials were timely submitted, the HDC again delayed consideration of the application on the stated grounds that the HDC did not have enough time to review the documents. (Id. ¶ 80.)

Plaintiffs allege that at the next HDC meeting in February 2017, HDC member Defendant Burns acknowledged that prior to joining the HDC he had spoken against Plaintiffs' application, and he recused himself from future votes. Plaintiffs also allege that Defendant Burns' wife, Catharine Burns, had also previously spoken against Plaintiffs' application, and that Defendant Burns and Catharine Burns had contemplated making an offer for the lot at the time of the Plaintiffs' purchase. (Id. ¶¶ 20, 81-84.) At the February HDC

meeting, Catharine Burns objected to Plaintiffs' new application and testified that the issues surrounding Plaintiffs' previously-rejected application had not been addressed. (Id. ¶¶ 91-92.) Plaintiffs allege that they objected to Catharine Burns' testimony but were admonished that such interruptions were improper. (Id. ¶¶ 89-90.) A motion to approve reconsideration of Plaintiffs' application failed 5 to 4, with Defendant Burns recusing himself, and the matter was tabled until the March 2017 meeting. (Id. ¶ 95.)

At the March 2017 HDC meeting, a motion to reconsider the application was denied on the stated grounds that the new application was not substantially different from the December 12, 2016 application that had been denied. (Id. ¶¶ 99-100.) On April 3, 2017, Plaintiffs filed an appeal to the Board of Adjustment. On May 3, 2017, the Board overruled the HDC and remanded the matter with instructions for the HDC to consider the second application. (Id. ¶¶ 102-103.) The HDC considered the new application at its June 13, 2017 meeting, and Plaintiffs allege that they presented evidence that their application was in compliance with the Town's Land Use Ordinances, that their plans were consistent with other houses in the neighborhood, including by height, setback, design of garage, roof shape, square footage, and lot coverage, and no evidence was presented in opposition. (Id. ¶¶ 105-131.) Plaintiffs allege that HDC members expressed a need to "protect the pattern of development as it existed in 1976," that HDC member Sweet referenced his "special knowledge" independent of the evidence presented as to the "size, scale and contributing structure," that HDC member Epting stated his concern about encouraging others to subdivide property that

had historically been larger, and that HDC member Rimer stated that "an awful lot of houses . . . look to be awfully close to the back property lines . . . so you can't have it both ways." Plaintiffs' application was denied. (Id. ¶¶ 132-38.) According to a June 28, 2017, written decision of the HDC, "the relocation of the driveway and the visibility of the garage was incongruous with the character of the District," and the application was "incompatible with HDC guidelines 'with respect to the openness and airiness of' the Lot and 'it[s] particular history over time.'" (Id. ¶¶ 142, 144.) The HDC determined that "Plaintiffs failed to prove that the size and scale of the proposed garage was congruous with the District" although Plaintiffs contend that "similar garages have been approved in the District." (Id. ¶ 147.) The HDC also determined that "the absence of a backyard" was incongruous, but Plaintiffs contend that this requirement relied on an old ordinance that had since been superseded. (Id. ¶ 150-51.) Plaintiffs contend that neither the administrative record nor applicable legal standards support the HDC's conclusions. (Id. ¶¶ 142-155.)

On June 23, 2017, before the HDC issued its opinion, Plaintiffs wrote to the Town requesting that a Certificate be issued on the grounds that "180 days passed without action by the HDC following the December 12, 2016 filing of the Application," in violation of North Carolina law. The request was denied on July 3, 2017, and Plaintiff appealed this decision and the decision denying their Certificate to the Town's Board of Adjustment. (Id. ¶¶ 140-41, 156-159.) The Board denied the appeal as to the passage of 180 days, but reversed the HDC's decision to deny the Certificate with instructions to the HDC to approve the Certificate. (Id.

¶¶ 160-164.) A written decision was provided to Plaintiffs on August 4, 2017. However, Plaintiffs allege that the regular August meeting of the HDC was cancelled and that Plaintiffs were provided with only 6-hours' notice of a special meeting held on August 28, 2017, regarding HDC's position on the decision of the Board of Adjustment. (Id. ¶¶ 165-169.) At the August 28, 2017 special meeting, the HDC, with Defendant Burns attending, met in closed session and then in open session, and voted to request that the Town consider an appeal of the Board's decision to the Superior Court. Defendant Burns again recused himself from voting, and the HDC represented that Defendant Burns did not participate in the closed session meeting despite being in the same room when the other members met. (Id. ¶¶ 171-182.)

On September 1, 2017, Plaintiffs filed their own appeal of the Board of Adjustment's Order to state court. (Id. ¶ 187.) Plaintiffs allege that by the time of the next HDC meeting, on September 12, 2017, the period for the Town to appeal the Board of Adjustment's decision had expired, and the Town chose not to appeal. (Id. ¶ 184.) Plaintiffs attended the September 12, 2017 meeting and requested the HDC issue the Certificate based upon the remand from the Board of Adjustment. (Id. ¶¶ 191-194, 198.) According to the Complaint, the minutes of the meeting reflect that the HDC was advised that the 180-day period for consideration of the Certificate would expire on September 18, and the Certificate would be approved administratively at that time. (Id. ¶ 197.) The HDC advised Plaintiffs that a request for information about the legitimacy of the Board of Adjustment's Order had been made to a

University of North Carolina School of Government professor and the HDC was awaiting a response. (Id. ¶ 201.) Plaintiffs allege that the professor had already emailed HDC member Rimer on September 11, 2017, the day before the HDC met on September 12, advising that the HDC had no options but to comply with the Board of Adjustment's determination. (Id. ¶¶ 201-203.) Plaintiffs allege that, even with that information, HDC members raised additional questions about signing the Certificate validating the Board of Adjustment's decision, including whether the chair of the HDC could sign the certificate without input from the HDC as a whole and whether the HDC could issue a certificate without a finding of congruity by the HDC or the Board of Adjustment. (Id. ¶¶ 205, 206). Plaintiffs allege that the professor wrote back again shortly after the start of the September 12, 2017 meeting that "the HDC has no discretion to do anything other than comply with the BOA order and to issue the COA." (Id. ¶¶ 210-211.) Plaintiffs contend that despite this information, the HDC took no action at the September 12, 2017 meeting, and the Town issued the Certificate on September 18, 2017, on the basis that the HDC had failed to act within a 180-day period as contemplated by North Carolina law. (Id. ¶¶ 213-218.) According to Plaintiffs, their application was singled out for disparate treatment based on "illegitimate, political or personal motives." (Id. ¶ 231.)

Plaintiffs commenced this action specifically alleging claims for violations of their state constitutional rights (Count 1) and their federal substantive due process rights (Count 2). Defendants filed the present Motion to Dismiss, contending that Plaintiffs' constitutional rights were not violated and that, if they were, Defendants are entitled to quasi-judicial or

8

qualified immunity.

## II.    DISCUSSION

### A.    Standard for Motion to Dismiss

A plaintiff fails to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6) when the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Thus, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

### B.    Federal Substantive Due Process Claim Under 42 U.S.C. § 1983

Plaintiffs allege violation of their federal substantive due process rights under the Fifth and Fourteenth Amendments. At the outset, the Court notes that the Court of Appeals for the Fourth Circuit has repeatedly stated that "federal courts are not the appropriate forum to challenge local land use determinations." Pulte Home Corp. v. Montgomery Cnty., Md., 909 F.3d 685, 688 (4th Cir. 2018). In this regard, the Fourth Circuit has cautioned that:

> land-use decisions are a core function of local government. Few other municipal functions have such an important and direct impact on the daily lives of those who live or work in a community. The formulation and application of land-use policies, therefore, frequently involve heated political battles, which typically pit

> local residents opposed to development against developers and local merchants supporting it. Further, community input is inescapably an integral element of this system. Subdivision control is an inherently discretionary system that allows—indeed, sanctions—compromise and negotiation between developers and the planners who represent the community.
>
> Resolving the routine land-use disputes that inevitably and constantly arise among developers, local residents, and municipal officials is simply not the business of the federal courts. . . . Accordingly, federal courts should be extremely reluctant to upset the delicate political balance at play in local land-use disputes.

Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 828-29 (4th Cir. 1995) (quoting Gardner v. City of Baltimore Mayor & City Council, 969 F.2d 63, 67–68 (4th Cir. 1992) (internal citation omitted)).

To assert a substantive due process claim, "(1) the claimant must establish possession of a property interest, (2) state action must deprive the claimant of the property interest, and (3) the state's action must fall so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." Front Royal and Warren Cnty. Indus. Park Corp., v. Town of Front Royal, Va., 135 F.3d 275, 288 (4th Cir. 1998) (internal quotation omitted). The property interest must be more than a "unilateral expectation"; it must be a "legitimate claim of entitlement." Biser v. Town of Bel Air, 991 F.2d 100, 104 (4th Cir.1993) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)) (internal quotations omitted). As the Fourth Circuit explained in Gardner, 969 F.2d at 68:

> It is well-settled that the Fourteenth Amendment itself does not create property interests. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. . . ." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33

L.Ed.2d 548 (1972). . . . The property interests created by state law have, however, been carefully circumscribed. As the Supreme Court has explained: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Id.

Several circuits have applied Roth's "claim of entitlement" standard to substantive due process challenges to municipal land-use decisions. Under this approach, whether a property-holder possesses a legitimate claim of entitlement to a permit or approval turns on whether, under state and municipal law, the local agency lacks all discretion to deny issuance of the permit or to withhold its approval. Any significant discretion conferred upon the local agency defeats the claim of a property interest. . . . Under this standard, a cognizable property interest exists "only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured." RRI Realty, 870 F.2d at 918. Moreover, the standard focuses on the amount of discretion accorded the issuing agency by law, not on whether or to what degree that discretion is actually exercised. "Even if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest." Id.

We believe that this standard appropriately balances the need for local autonomy in a matter of paramount local concern with recognition of constitutional protection at the very outer margins of municipal behavior. The standard represents a sensitive recognition that decisions on matters of local concern should ordinarily be made by those whom local residents select to represent them in municipal government-not by federal courts. It also recognizes that the Fourteenth Amendment's Due Process Clause does not function as a general overseer of arbitrariness in state and local land-use decisions. In our federal system, that is the province of the state courts.

The Fourth Circuit has recently "reiterated the long standing rule" that "any significant discretion left to zoning authorities defeats the claim of a property interest," and that where "the zoning authority retained discretion to grant or deny applications for building permits,

the landowner's claims under the Fourteenth Amendment failed." Pulte, 909 F.3d at 692

(internal quotations omitted).

Moreover, even if a cognizable property interest exists, a substantive due process claim

based on zoning or land-use determinations requires state action "so arbitrary and irrational"

that it has no conceivable rational relationship to the exercise of the state's traditional police

powers. As explained by the Fourth Circuit:

> The protection of substantive due process is indeed narrow and covers only
> state action which is "so arbitrary and irrational, so unjustified by any
> circumstance or governmental interest, as to be literally incapable of avoidance
> by any pre-deprivation procedural protections or of adequate rectification by
> any post-deprivation state remedies." Rucker v. Harford County, 946 F.2d 278,
> 281 (4th Cir.1991), cert. denied, 502 U.S. 1097, 112 S. Ct. 1175, 117 L.Ed.2d
> 420 (1992). And in the context of a zoning action involving property, it must be
> clear that the state's action "'has no foundation in reason and is a mere arbitrary
> or irrational exercise of power having no substantial relation to the public
> health, the public morals, the public safety or the public welfare in its proper
> sense.'" Nectow v. Cambridge, 277 U.S. 183, 187–88, 48 S. Ct. 447, 448, 72 L.
> Ed. 842 (1928) (quoting Village of Euclid v. Ambler Realty Co., 272 U.S. 365,
> 395, 47 S. Ct. 114, 121, 71 L. Ed. 303 (1926)). In more recent decisions, the
> Supreme Court has narrowed the scope of substantive due process protection
> in the zoning context so that such a claim can survive only if the alleged purpose
> behind the state action has no conceivable rational relationship to the exercise
> of the state's traditional police power through zoning. See Village of Belle Terre
> v. Boraas, 416 U.S. 1, 94 S. Ct. 1536, 39 L.Ed.2d 797 (1974).

Sylvia Dev. Corp., 48 F.3d at 827-28.

Defendants maintain that due to the degree of discretion delegated to the HDC by the

Town's Land Use Ordinances in deciding whether to issue a Certificate, Plaintiffs did not

possess a protected property interest in the Certificate, critical to their due process claims.

(Defs.' Br. [Doc. #11] at 10-12.) As set out above, "a cognizable property interest exists only

when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured." Gardner, 969 F.2d at 68 (internal quotation omitted). With respect to the state property law at issue here, North Carolina General Statutes provide that a municipality may establish a preservation commission within the zoning jurisdiction of the municipality, and that commission may "[r]eview and act upon proposals for alterations, demolitions, or new construction within historic districts." N.C.G.S. § 160A-400.8. Further, state law provides that a Certificate of Appropriateness is required to build, demolish or alter structures in a designated historic district, as follows:

> (a) From and after the designation of a landmark or a historic district, no exterior portion of any building or other structure (including masonry walls, fences, light fixtures, steps and pavement, or other appurtenant features), nor above-ground utility structure nor any type of outdoor advertising sign shall be erected, altered, restored, moved, or demolished on such landmark or within such district until after an application for a certificate of appropriateness as to exterior features has been submitted to and approved by the preservation commission. The municipality shall require such a certificate to be issued by the commission prior to the issuance of a building permit or other permit granted for the purposes of constructing, altering, moving, or demolishing structures, which certificate may be issued subject to reasonable conditions necessary to carry out the purposes of this Part. A certificate of appropriateness shall be required whether or not a building or other permit is required.

> For purposes of this Part, "exterior features" shall include the architectural style, general design, and general arrangement of the exterior of a building or other structure, including the kind and texture of the building material, the size and scale of the building, and the type and style of all windows, doors, light fixtures, signs, and other appurtenant fixtures. In the case of outdoor advertising signs, "exterior features" shall be construed to mean the style, material, size, and location of all such signs. Such "exterior features" may, in the discretion of the local governing board, include historic signs, color, and significant landscape, archaeological, and natural features of the area.

> . . . .

(c) . . . Prior to issuance or denial of a certificate of appropriateness the commission shall take such steps as may be reasonably required in the ordinance and/or rules of procedure to inform the owners of any property likely to be materially affected by the application, and shall give the applicant and such owners an opportunity to be heard. In cases where the commission deems it necessary, it may hold a public hearing concerning the application. All meetings of the commission shall be open to the public, in accordance with the North Carolina Open Meetings Law, Chapter 143, Article 33C.

(d) All applications for certificates of appropriateness shall be reviewed and acted upon within a reasonable time, not to exceed 180 days from the date the application for a certificate of appropriateness is filed, as defined by the ordinance or the commission's rules of procedure. As part of its review procedure, the commission may view the premises and seek the advice of the Division of Archives and History or such other expert advice as it may deem necessary under the circumstances.

(e) An appeal may be taken to the Board of Adjustment from the commission's action in granting or denying any certificate, which appeals (i) may be taken by any aggrieved party, (ii) shall be taken within times prescribed by the preservation commission by general rule, and (iii) shall be in the nature of certiorari. Any appeal from the Board of Adjustment's decision in any such case shall be heard by the superior court of the county in which the municipality is located.

N.C.G.S. § 160A-400.9. The Town of Chapel Hill adopted Land Use Management Ordinances implementing these provisions. According to the Town's Land Use Ordinances, the purpose of a historic district designation is to "ensure, insofar as possible, that buildings or structures in the historic district shall be in harmony with other buildings or structures located therein." Land Use Management Ordinance § 3.6.2. Under the heading "Review criteria," for a historic district, the Town requires that "the review shall take into account the historical and/or architectural significance of the structure under consideration and the

exterior form and appearance of any proposed additions or modifications to that structure." Id. § 3.6.2(e)(1). The process requires the HDC to "make findings of fact indicating the extent to which the application is or is not congruous with the historic aspects of the historic district." Id. § 3.6.2(e)(3). In addition, the HDC must consider the height, setback, and placement of the building, "in relation to the average [height, setback, and placement] of the nearest adjacent and opposite buildings," as well as exterior construction materials, architectural detailing, roof shapes, the general form and proportions of the building, appurtenant fixtures and other features such as lighting, structural conditions, and architectural scale. Id. § 3.6.2(e)(4). Ultimately, the Town requires structures to "be in harmony with other buildings," and the HDC must consider whether an applicant's proposal is congruous with the historic aspect of the historic district, as well as the average building height and setbacks in relation to nearby structures, the architectural scale, and the general form and proportion of the building. Thus, the HDC has considerable discretion in determining whether to issue a Certificate and what conditions to impose. Given these state law provisions, Plaintiffs cannot show that HDC "lacks all discretion to deny issuance of the permit," and Plaintiffs have therefore failed to allege a legitimate claim of entitlement to a permit for a federal constitutional claim.[1] Plaintiffs

---

[1] Notably, the Court here does not reach the question whether the HDC's denial of the Certificate of Appropriateness in this case was proper under state law. As set out at length above, state and local zoning determinations, including whether a zoning decision properly complied with state law, are local issues to be addressed in local administrative proceedings and in state court. See, e.g., Tri-County Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 441 (4th Cir. 2002) ("We have repeatedly stated that 'governmental actions that are violative of state law are properly challenged in state courts which exist, in part, to protect citizens from abuses of state law.'" (quoting Front Royal, 135 F.3d at 288)). Thus, to the extent that Plaintiffs contend that the HDC considered criteria beyond the specific criteria set out in the Land Use Ordinances, or otherwise failed to comply with state law in exercising its discretion, those are issues of state law that do not state a

15

have therefore failed to allege a protected property interest in a Certificate of Appropriateness for purposes of stating a substantive due process claim. [2]

Plaintiffs rely on <u>Browning-Ferris Indus. of South Atl., Inc. v. Wake Cnty.</u>, 905 F. Supp. 312, 319 (E.D.N.C. 1995), but that case does not support Plaintiffs' contentions here. In <u>Browning-Ferris</u>, plaintiffs claimed a vested property right under state law in the development of a solid waste facility by virtue of a town's issuance of a valid permit to begin construction. <u>Id.</u> at 314, 317. Similarly, in <u>Scott v. Greenville Cnty.</u>, 716 F.2d 1409 (4th Cir. 1983), the Fourth Circuit held that the plaintiff, a developer, possessed a vested interest under state law in obtaining a building permit to construct low income housing because "the county was required by state law to issue a building permit 'upon presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance.'" <u>Gardner</u>, 969 F.2d at 69 (quoting <u>Scott</u>, 716 F.2d at 1418). In <u>Marks v. City of Chesapeake Va.</u>, 883 F.2d 308 (4th Cir. 1989), the City Planning Commission approved Plaintiff's application for a

---

claim for a federal constitutional violation. <u>See, e.g.</u>, <u>Biser</u>, 991 F.2d at 104 ("In every respect then, the Board of Appeals possessed significant discretion under <u>Gardner</u> in deciding whether to grant special exceptions. Biser had only a unilateral expectation that he would receive the special exception. He possessed no legitimate claim of entitlement, and thus no property right cognizable under the due process clause. The fact that Biser believes that the Board acted arbitrarily on his application does nothing to change the fact that he was not deprived of any entitlement or right.").

[2] The right to a permit "must exist before the local agency denies the permit application—the claim of entitlement must come from an existing legislative or administrative standard." <u>Biser</u>, 991 F.2d at 104 (internal quotation and emphasis omitted) ("Arbitrary conduct standing alone does not create a legitimate claim of entitlement, even if it later leads to a state court judgment. . . . Thus, the fact that Biser obtained a state court order, enforceable by that court's power of contempt, barring the Board of Appeals from denying his application for a special exception, does not mean that he had a preexisting legal right to that special exception.").

permit for his palmistry business, finding that the intended use was permitted under the new zoning designation for the property and that the proposed business would "pose no adverse impact on the community," thus creating a vested property interest, but the City Council refused to issue the permit, apparently ceding to religious objections raised by nearby residents. Id. at 309-10. In Mays-Ott, Inc. v. Town of Nags Head, 751 F. Supp. 82 (E.D.N.C. 1990), the court found that the plaintiff had established a claim for deprivation of a vested property right where the plaintiff had a valid permit and had made substantial expenditures in reliance on the permit. In finding a protected property right, the Court relied on state law, which recognized a vested right to carry on nonconforming use of land if, prior to the revocation of the permit or enactment of the zoning ordinance, the developer made a good faith, substantial beginning of construction and incurred substantial expense. Id. Plaintiffs also rely upon Rucker v. Hartford Cnty., Md., 946 F.2d 278 (4th Cir. 1991), but that case involved deprivation of life, another protected interest under the Fourteenth Amendment.[3]

In addition to failing to allege a protected property interest in the Certificate of Appropriateness, Plaintiffs have also failed to allege government conduct "so arbitrary or irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate

---

[3] Plaintiffs also cite to a District of Connecticut decision, TLC Development, Inc. v. Town of Branford, 855 F. Supp. 555 (D. Conn. 1994), to support their view that a town's reliance on subjective beliefs and considerations not authorized by a local ordinance violates due process rights apart from any claim of a property interest. However, in TLC Development, as in Browning-Ferris, Scott, Marks, and Mays-Ott, plaintiffs established non-discretionary entitlement to the permit, giving rise to a vested property interest.

rectifications by any post-deprivation state remedies." Rucker, 946 F.2d at 281. The state

action must be "conscience shocking, in a constitutional sense." Huggins v. Prince George's

Cnty., 683 F.3d 525, 535 (4th Cir. 2012) (quoting County of Sacramento v. Lewis, 523 U.S.

833, 847 (1998)). "In the context of local zoning actions, the local government's 'alleged

purpose' must lack any 'conceivable rational relationship to the exercise of the state's

traditional police power.'" Siena Corp. v. Mayor and City Council of Rockville, Md., 873 F.3d

456, 463-64 (4th Cir. 2017) (quoting Sylvia Dev. Corp., 48 F.3d at 827). Here, Plaintiffs allege

that the HDC violated their substantive due process rights by: causing Plaintiffs to engage in

numerous and inconsistent redesigns, raising new objections throughout the process with

differing reasons, conducting undisclosed private meetings, having conflicts or animus toward

Plaintiffs, seating some members were not qualified to serve by virtue of interest, experience

or education, and basing its decisions on considerations not provided for in the Town's Land

Use Ordinances. (Pls.' Br. [Doc. #15] at 16-23). However, none of these contentions reflect

actions beyond the broad limits of legitimate government action, nor do the contentions

reflect an alleged purpose that lacks any conceivable relationship to the exercise of the state's

traditional regulatory powers. In addition, none of these contentions shock the conscience or

otherwise reflect government action that is incapable of being rectified by procedural

protections or state remedies. Indeed, as in other similar cases, the Plaintiffs took advantage

of available state remedies by appealing to the Board of Adjustment and obtaining the

Certificate of Appropriateness approximately 70 days after the appeal was filed. See, e.g.,

Front Royal, 135 F.3d at 275 (4th Cir. 1988) (concluding that because the writ of mandamus was available from the state courts, "the state courts were capable of rectifying, and did rectify, the Town's dereliction"); Sylvia Dev. Corp., 48 F.3d at 829 (noting that if public officials "circumvent legally established criteria in their decisionmaking," those actions "that violate state law are properly challenged in state courts," but "the legality of a zoning decision under applicable state law is not determinative of whether the decision violated federal substantive due process," and "the fact that established state procedures were available to address and correct illegal actions by the Board belies the existence of a substantive due process claim."); Tri-County Paving, 281 F.3d at 441 ("More importantly, whether the County violated state law in regulating land use is not determinative of whether TCP's substantive due process rights were violated. If state law is transgressed, state courts are open to redress that violation and remedy an unlawful deprivation of property. . . . And the fact that state courts are available to redress and correct violations of state law belies the existence of a substantive due process claim." (internal quotation omitted)). Plaintiffs here were likewise able to take advantage of available administrative and state court remedies to address Plaintiffs' alleged violations, based on the allegations set out in the Complaint.

For all of these reasons, the Court concludes that Plaintiff has failed to allege a viable claim under the substantive due process clause of the Fourteenth Amendment, and Count 2 and the related claim for damages in Count 3 should be dismissed.

C.    Procedural Due Process

In the Complaint, Plaintiffs' federal constitutional claim is specifically labeled as a substantive due process claim, and it is not clear that Plaintiffs are even alleging a procedural due process claim. Although Plaintiffs generally address such a claim in the briefing, no amendment was filed to even attempt to state a procedural due process claim.

Moreover, to state a procedural due process claim, a plaintiff must allege: "(1) that it had a property interest; (2) of which the [defendant] deprived it; (3) without due process of law." Tri-County Paving, Inc., 281 F.3d at 436. Here, Plaintiffs have failed to state a basis for a protected property interest, as discussed above. In addition, in evaluating a procedural due process claim, a court "must consult the entire panoply of predeprivation and post deprivation process provided by the state." Fields v. Durham, 909 F.2d 94, 97 (4th Cir. 1990)(citing Zinermon v. Burch, 494 U.S. 113, 126 (1990)). According to the Complaint, Plaintiffs submitted a written application for a Certificate, met with Board members informally in advance of consideration of the Certificate, attended public meetings to present their claim, received a decision from which they did not appeal, submitted a new application that was later denied, and appealed the adverse decision to the Board of Adjustments (where they had success), with a further ability to appeal to the state courts. Ultimately, North Carolina law restricts the time for a government body to evaluate the application, and Plaintiffs were awarded a Certificate administratively due to the passage of time (6 months). NCGS § 160A-400.9(d) (providing that a certificate must be acted upon "within a reasonable time, not to

exceed 180 days from the date of the application"). An appeal of a decision by the HDC may be taken by "any aggrieved party" to the Board of Adjustment. Id. at § 400-9(e). Any further appeal "shall be heard by the superior court of the county in which the municipality is located." Id. at § 400-9(f). As pled in the Complaint, ample administrative and judicial procedures were in place to guard against an improper determination or unnecessary delay, and Plaintiffs took advantage of those options to obtain their Certificate of Appropriateness. Based on the allegations in the Complaint, Plaintiffs elected not to exercise their appeal rights until April 2017, and they were successful on appeal and ultimately obtained their Certificate in September 2017. See also Tri-County Paving, Inc., 281 F.3d 437-38, (rejecting a procedural due process claim where similar remedies were provided, and further noting that "TCP could have petitioned a state court for a writ of mandamus to compel the County to issue a building permit if it was unlawfully withheld. North Carolina courts have stated that mandamus is the proper procedure to compel local officials to issue a building permit when a party shows that it has met all of the permit requirements. . . . TCP also could have filed an inverse condemnation suit in state court. . . . TCP chose not to pursue any of these avenues of relief in the state courts. It therefore cannot complain now that the state did not provide adequate procedures.") Thus, based on the allegations included in the Complaint, Plaintiffs have failed to state a claim for a procedural due process violation.

D.    Equal Protection

As noted above, Plaintiffs' federal constitutional claim is specifically labeled as a substantive due process claim. The Complaint does not contain a specific count nor a request for damages based on a denial of equal protection. Although Plaintiffs generally address such a claim in the briefing, no amendment was filed to even attempt to assert a claim for violation of the federal Equal Protection Clause.

Moreover, Plaintiffs have failed to set out the factual basis for a federal Equal Protection Clause claim. "The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). To establish a viable equal protection claim, Plaintiffs must plead more than the fact that "a benefit was denied to one person while conferred on another." Sylvia Dev. Corp., 48 F.3d at 819. To the extent neither a fundamental right nor a suspect classification is at issue, "the pertinent question for determining whether the governmental action violated the Equal Protection Clause is whether [government actors] reasonably could have believed that the action was rationally related to a legitimate governmental interest." Front Royal, 135 F.3d at 290; City of Cleburne, 473 U.S. at 440. With respect to equal protection claims involving land use decisions, the Fourth Circuit recently reiterated that "[t]he zoning authorities' decision must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. The test is not a subjective one." Pulte, 909 F.3d at 693

(internal quotation omitted). "'The actual motivation for the [local government's] actions [is] irrelevant.'" Id. (quoting Tri-County Paving, Inc., 281 F.3d at 439). Where rational distinctions are reasonably conceivable, "even if they were not the real reasons for treating [Plaintiffs] differently[,] . . . that is the end of our inquiry." Pulte, 909 F.3d at 696. ("It is not this court's place to second-guess the wisdom of elected local officials in making inherently discretionary zoning decisions. . . . Local land use decisions are a quintessential example of subjective and individualized action by decisionmakers vested with the discretion needed to balance competing interests.").

In the briefing, Plaintiffs rely in part on a statement made by Defendant Epting, that in "over ten months of my service, all but three applications [for Certificates] were acted on in the same meeting where they were first presented" and "more than 90 percent of COA applications are granted." (Id. ¶¶ 238-239.) However, the statements are included in a larger letter attached to the Complaint regarding the HDC procedures, and these statements in context are as follows:

> Finally, let me say that in my time on the HDC, admittedly only ten months, I can recall only one application that was denied, and that denial was overturned by the Board of Adjustment on appeal. Conversations among my colleagues and a review of historic summaries of HDC actions, suggest to me that more than 90 percent of COA applications are granted in meetings held within thirty days of the completed application's receipt. Over the then months of my service, all but three applications were acted on the same meeting where they were first presented.
>
> The more difficult, contested matters will take a little longer, of course, but my actual experience tells me that there is no need to reduce the 180 day period in which the HDC must act. Worse, to do so may be counterproductive for those

> applications that for reasons beneficial to the applicants, may take the full 180 days to complete, as was recently the case.

This statement reflects that 10% of applications are not granted in meetings held within 30 days, and that the "difficult, contested matters" (like Plaintiffs') will take longer. Thus, this statement itself would not provide a factual basis for an equal protection claim. Plaintiffs also generally contend that other houses and garages exist in the Historic District of the same size as Plaintiffs' proposal, but that Plaintiffs were treated differently because their application was denied. However, Defendants maintain that Plaintiffs' allegations are conclusory, and that Plaintiffs do not allege that other citizens made requests to relocate or demolish a structure on their property similar to Plaintiffs, nor that "others' application for construction of new homes with similar proportions to Plaintiffs were treated differently" before the HDC. (Defs.' Reply [Doc. #18] at 2-3.) On this issue, the Court agrees that Plaintiffs have failed to allege facts regarding a similarly-situated applicant treated differently. See Tri-County Paving, Inc., 281 F.3d at 439 ("The County's granting of other building permits is irrelevant because TCP has not shown that any other company applied for a permit to construct a facility with environmental and safety concerns similar to an asphalt plant. Nor has TCP shown that any other building permit applicant met with the kind of public apprehension that TCP's proposed plant generated. The existing asphalt plant's continued operation is likewise inapposite because the County's actions dealt with future, further development and did not affect existing industry. Thus, TCP has failed to state a valid equal protection claim.").

Moreover, the facts alleged by Plaintiffs specifically set out the HDC's rationale, which

provides a reasonably conceivable state of facts that could provide a rational basis for the classification. In this regard, Plaintiffs allege that HDC members expressed a need to "protect the pattern of development as it existed in 1976," that HDC member Sweet referenced his "special knowledge" as to the "size, scale and contributing structure," that HDC member Epting stated his concern about encouraging others to subdivide their property, that according to a June 28, 2017, written decision of the HDC, "the relocation of the driveway and the visibility of the garage was incongruous with the character of the District," the application was "incompatible with HDC guidelines with respect to the openness and airiness of the Lot and it[s] particular history over time," that "Plaintiffs failed to prove that the size and scale of the proposed garage was congruous with the District," and that "the absence of a backyard" was incongruous. These are reasonably conceivable rationales that are rationally related to the HDC's purpose to "ensure, insofar as possible, that buildings or structures in the historic district shall be in harmony with other buildings or structures located therein." Land Use Management Ordinance § 3.6.2; see also Front Royal, 135 F.3d at 290 (directing the district court to dismiss equal protection claims where "[r]egardless of the actual motivation for the decision . . . Town officials reasonably could have believed that the decision was rationally related to a legitimated government interest.") As noted above, to the extent Plaintiffs contend that the determination was not a proper application of the Land Use Ordinance or otherwise failed to comply with state law, those are issues for the state court and would not provide a basis for a federal constitutional claim. Ultimately, the facts alleged by Plaintiff would not

state a claim for violation of the Fourteenth Amendment's Equal Protection Clause.

E.    Quasi-judicial Immunity and Qualified Immunity

The individual defendants assert that all claims against them are predicated on their conduct enforcing the Town's Ordinances by voting, and that such claims cannot be asserted in a § 1983 action based upon the doctrine of quasi-judicial immunity. Defendants also contend that, absent a finding of quasi-judicial immunity, they are entitled to the defense of qualified immunity. These are potentially-applicable defenses that would require further analysis and consideration, but because the Court has found that Plaintiffs failed to state a claim for a federal constitutional violation, the Court need not reach these defenses.

F.    State Law Claims

Finally, the Court notes that Plaintiffs assert various state constitutional claims in Count 1, with claims for punitive damages and attorney's fees under state law in Counts 4 and 5. Given the determination that Plaintiffs have failed to state a claim for a federal constitutional violation, there is no reason for this Court to undertake analysis of the state law claims. Indeed, as set out at length above, local land use determinations are issues of state law best resolved in state court, and any related claims for alleged state constitutional violations are similarly best addressed in state court when no federal law claims remain. Therefore, upon dismissal of the federal § 1983 claims, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367(c)(3). Given that this case was removed

from state court, the case should be remanded to state court with respect to the remaining state claims.

III.    CONCLUSION

As in similar recent cases considered by the Fourth Circuit, "[t]his case is a garden-variety zoning dispute recast in constitutional terms," Siena Corp., 873 F.3d at 466, and "[r]esolving the routine land-use disputes that inevitably and constantly arise among developers, local residents, and municipal officials is simply not the business of the federal courts" Pulte, 909 F.3d at 697 (quoting Gardner, 969 F.2d at 67).

IT IS THEREFORE RECOMMENDED that the Defendants' Motion to Dismiss be granted as to Plaintiffs' federal § 1983 claims (Counts 3 and 4), and that the remaining state law claims be remanded to state court.

This, the 8th day of February, 2019.

_/s/ Joi Elizabeth Peake_
United States Magistrate Judge